**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **USAA CASUALTY INSURANCE COMPANY, a/s/o JOAN SONNEN,** | : | **CIVIL ACTION NO. 1:12-CV-1178** |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **METROPOLITAN EDISON COMPANY,** | : | |
| | : | |
| | : | |
| **Defendant/Third Party Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCHNEIDER ELECTRIC USA, INC. f/k/a SQUARE D COMPANY,** | : | |
| | : | |
| **Third Party Defendant.** | : | |

**MEMORANDUM**

Plaintiff USAA Casualty Insurance Company ("USAA"), as subrogee of Joan Sonnen, filed the above-captioned action against defendant Metropolitan Edison Company ("Met-Ed"), alleging negligence and willful and/or wanton misconduct arising from an electrical fire in Ms. Sonnen's home. (Doc. 1). Met-Ed subsequently impleaded Schneider Electric USA, Inc. ("Schneider"), formerly known as Square D Company, as a third-party defendant pursuant to Federal Rule of Civil Procedure 14. (Doc. 48). Presently before the court is Met-Ed's motion for summary judgment (Doc. 58) against USAA, relying on a motion *in limine* to exclude the testimony of USAA's expert witness, Ronald J. Panunto, P.E., C.F.E.I.,

C.F.C. (Doc. 56).  For the reasons that follow, the court will deny Met-Ed's motion *in limine* as well as the motion for summary judgment.

## I.   <u>Factual Background & Procedural History</u>

### A.   Factual Background

On November 17, 2010, a fire occurred at the home of Joan Sonnen in Manchester, Pennsylvania as a result of an electrical malfunction.  (Doc. 59 ¶ 5; Doc. 71 ¶ 5).  Ms. Sonnen has a property insurance policy with plaintiff USAA, a Texas corporation licensed to do business in Pennsylvania.  (Doc. 10 ¶¶ 1, 6).

Defendant Met-Ed is a Pennsylvania corporation that provides electricity to Ms. Sonnen's home via its 720 distribution line.  (<u>Id.</u> ¶ 2; Doc. 59 ¶ 7; Doc. 71 ¶ 7).  On November 17, 2010, the breaker at the Zionsview substation for the 720 distribution line opened at 12:57 p.m. and reclosed seven seconds later.  (Doc. 59 ¶ 8; Doc. 71 ¶ 8).  Thereafter, an electrical fire ignited at the main circuit breaker in the electrical panel in Ms. Sonnen's basement.  (Doc. 59 ¶ 9; Doc. 71 ¶ 9).  This fire was initially reported to the Union Fire Department at approximately 5:40 p.m.  (Doc. 59 ¶ 6; Doc. 71 ¶ 6).

### B.   Procedural History

On June 20, 2012, USAA, as subrogee of Joan Sonnen, filed a complaint (Doc. 1) against Met-Ed and thereafter filed an amended complaint (Doc. 10) on August 1, 2012, alleging claims for negligence and willful and/or wanton misconduct related to the electrical fire.  (Doc. 59 ¶¶ 1-2; Doc. 71 ¶¶ 1-2).  Met-Ed filed a motion to dismiss (Doc. 14) pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 59

¶ 3; Doc. 71 ¶ 3).  On January 10, 2013, the court adopted the Report and

Recommendation of Magistrate Judge Methvin (Doc. 23) and denied the motion to

dismiss.  (Doc. 30; Doc. 59 ¶ 4; Doc. 71 ¶ 4).

On May 5, 2013, Met-Ed filed a third-party complaint against Schneider,

alleging strict liability for a defective main circuit breaker and contribution or

indemnification for negligence.  (Doc. 48).  Schneider filed an answer on June 11,

2013 and included a cross-claim against Met-Ed for contribution or indemnification.

 (Doc. 51).

## C.   Expert Testimony

USAA proffers the expert report and testimony of Ronald J. Panunto, P.E.,

C.F.E.I., C.F.C. in support of its claims.  (See Doc. 59-1, Ex. 1; Doc. 71-1, Ex. 1).  Mr.

Panunto earned a Bachelor of Science degree in electrical engineering from Drexel

University and is a registered professional engineer in Pennsylvania, New York,

New Jersey, North Carolina, Delaware, and Connecticut.  (See Doc. 71-4, Ex. 4).  He

is a senior member of the Institute of Electrical and Electronic Engineers and a

Certified Fire and Explosion Investigator with the National Association of Fire

Investigators.  (Id.)  Mr. Panunto has previously held positions as a Field

Engineering and Substation Design Branch Manager at PECO Energy and as a

Project Manager at Gannett Fleming, Inc.  (Id.)  Currently, Mr. Panunto is the

President of Dawson Engineering, an electrical design and forensic engineering

company.  (Id.; Doc. 59-2, Ex. 2, Panunto Dep. 5:22-7:6, Dec. 19, 2013; Doc. 71-3, Ex.

3, Panunto Dep. 5:22-7:6, Dec. 19, 2013).  As a forensic engineer, Mr. Panunto has

investigated or provided testimony in approximately 226 cases during the past five years.  (Panunto Dep. 12:2-14:2).  Significantly, Mr. Panunto has over 40 years of experience in the field of electrical utility and power system engineering.  (See Doc. 71-4, Ex. 4).

In his expert report, Mr. Panunto opines that Met-Ed did not adequately maintain trees and tree branches along the 720 distribution line as required by Rule 218 of the National Electric Safety Code ("NESC") and the Pennsylvania Public Utility Commission ("PPUC").  (Doc. 59 ¶ 11; Doc. 71 ¶ 11; see also Doc. 59-1, Ex. 1 at 4; Doc. 71-1, Ex. 1 at 4).  As a result of inadequate vegetation management, Met-Ed's customers, including Ms. Sonnen, suffered many power outages prior to the electrical fire at issue.  (Doc. 59 ¶ 11; Doc. 71 ¶ 11; see also Doc. 59-1, Ex. 1 at 4; Doc. 71-1, Ex. 1 at 4).  These repeated power outages caused repeated high-voltage transients, which in turn caused accelerated wear and eventual failure of the main circuit breaker in Ms. Sonnen's electrical panel.  (Doc. 59 ¶ 11; Doc. 71 ¶ 11; see also Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5).  Despite Met-Ed's awareness of customer complaints and repeated power outages on the 720 distribution line, Met-Ed did not perform necessary vegetation management to troubleshoot the problem.  (Doc. 59 ¶ 11; Doc. 71 ¶ 11; see also Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5).

Mr. Panunto concludes that, on November 17, 2010, a power outage and resultant high-voltage transients (due to vegetation contact) caused the electrical failure at the main circuit breaker in Ms. Sonnen's electrical panel.  (Doc. 59 ¶ 11; Doc. 71 ¶ 11; see also Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5).  Specifically, the

4

high-voltage transients caused the main circuit breaker to flash over and electric arcing ignited the insulation on the electrical panel's wiring.  (Doc. 59 ¶ 11; Doc. 71 ¶ 11; see also Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5).

Met-Ed and Schneider filed motions for summary judgment on January 13, 2014.  (Docs. 58, 61).  As part and parcel of its motion for summary judgment, Met-Ed moves *in limine* to exclude the expert testimony of Mr. Panunto.[1]  (Doc. 56). Met-Ed argues that USAA cannot meet its burden of proof as to the negligence claim because Mr. Panunto's expert opinions are not sufficiently reliable under Federal Rule of Evidence 702 to constitute admissible evidence.  (Doc. 60 at 4-9). Thus, as a threshold issue, the court must determine whether Mr. Panunto's testimony and report are admissible.  Thereafter, the court will address Met-Ed's motion for summary judgment.

## II.  **Legal Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only when "there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A factual dispute is material if it might affect the outcome of the action under applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a

---

[1] On January 27, 2013, USAA filed a motion to strike the motion *in limine* and related portions of the motion for summary judgment as untimely.  (Doc. 65).  The court denied the motion to strike for the reasons set forth in the court's order dated February 4, 2014 (Doc. 73) and, accordingly, the court will not revisit USAA's arguments here.  (See Doc. 71 ¶ 13).

reasonable factfinder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson, 477 U.S. at 250-57; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). When there is a proper challenge to the admissibility of evidence, such as a motion *in limine* to exclude expert testimony, the party offering the expert bears the burden of establishing the admissibility of such expert's testimony and report by a preponderance of the evidence. See Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 331 (M.D. Pa. 2009); see also *In re* Paoli R.R. Yard PCB Litig.

("Paoli II"), 35 F.3d 717, 744-46 (3d Cir. 1994).

Admissibility of expert testimony is a question of law governed by Federal Rule of Evidence 702.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).  Trial courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is . . . reliable." Id. at 589.  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; © the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The Third Circuit has explained that Rule 702 sets forth three separate restrictions on the admission of expert testimony: qualification, reliability, and fit.  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  Rule 702 embraces a "liberal policy of admissibility," pursuant to which it is preferable to admit any evidence that may assist the trier of fact.  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

## III.  Discussion

In the instant motions, Met-Ed raises four main issues for the court's consideration.  First, Met-Ed requests that the court strike Mr. Panunto's supporting affidavit and deposition errata sheet under the sham affidavit doctrine.  (Doc. 74 at 3-7).  Second, Met-Ed argues that USAA may not rely on Mr. Panunto's

expert opinion testimony because he is not qualified to give such opinions and his opinions are neither reliable nor relevant.  (See Doc. 57).  Third, Met-Ed contends that, even if Mr. Panunto's opinions are admissible, Rule 24 of Met-Ed's Electric Service Tariff[2] (the "Tariff") limits MetEd's liability for claims arising from a customer's electrical equipment and therefore bars the negligence claim.  (Id. at 10-11).  Finally, Met-Ed asserts that USAA lacks adequate evidence to sustain the willful or wanton misconduct claim, thereby limiting Met-Ed's liability to $500 under Rule 24 of the Tariff and depriving the court of subject-matter jurisdiction.[3]  (Id. at 11-13).  The court will address each issue *seriatim*.

### A.    Sham Affidavit Doctrine

Met-Ed moves to strike Mr. Panunto's affidavit and errata sheet, which USAA submitted in opposition to the motion *in limine* and motion for summary judgment, under the sham affidavit doctrine.  (Doc. 74 at 3-7; see Doc. 64-4, Ex. C; Doc. 64-5, Ex. D; Doc. 71-2, Ex. 2).  "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.  A sham

---

[2] A tariff is a set of operating rules imposed by the Commonwealth that a public utility must follow in order to provide services to customers.  PPL Elec. Utilities Corp. v. Pa. Pub. Util. Comm'n, 912 A.2d 386, 402 (Pa. Commw. Ct. 2006). Public utility tariffs have the force and effect of law, and tariffs are binding on both the utility and customer.  Id.

[3] In its opposition to the instant motion, USAA concedes its willful misconduct claim and pursues only a claim for wanton misconduct.  (Doc. 72 at 10; see also Doc. 75 at 6).

affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). When it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, the court may disregard the contradictory affidavit. Id.; Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004); see also EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 267-71 (3d Cir. 2010) (applying sham affidavit doctrine to deposition errata sheet).

However, if the proponent offers a satisfactory explanation for contradictory statements or independent evidence in the record to corroborate the affidavit, courts generally refuse to disregard the affidavit. See Jiminez, 503 F.3d at 254; Rossi v. All Holding Co., Inc., No. 3:CV-11-1641, 2014 WL 346934, at *6-7 (M.D. Pa. Jan. 30, 2014). Disregarding statements in an affidavit or errata sheet is appropriate only on "clear and extreme facts;" that is, when the affidavit is "flatly contradictory" to the prior testimony. Coleman v. Cerski, No. 3:04-CV-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (citing Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).

In the case *sub judice*, Mr. Panunto's statements do not flatly contradict his deposition testimony. Rather, his declarations are better characterized as elaborating upon his deposition testimony. In paragraph 8 of the affidavit, Mr. Panunto attests that "[m]ultiple voltage transients were occurring on the electrical lines sufficient to cause the breakdown of the main circuit breaker." (Doc. 64-4, Ex.

C at 2; Ex. 71-2, Ex. 2 at 2).  In his deposition, Mr. Panunto testified that "under most cases the transients that the electric company produces are not sufficiently powerful or sufficiently high voltage to cause the breakdown of the breakers." (Panunto Dep. 65:17-20).  However, circuit breakers are designed to handle transients "only up to a certain extent."  (Panunto Dep. 62:24-66:3).  Mr. Panunto further stated that 24 breaker trips in the two years prior to the fire was "terrible power quality" and caused "sustained trauma" on Ms. Sonnen's electrical equipment.  (Panunto Dep. 72:5-11).  Viewed in this context, Mr. Panunto's affidavit is consistent with his cumulative deposition testimony.

In paragraph 6 of his affidavit, Mr. Panunto reiterates his opinion that Met-Ed failed to keep its 720 distribution line free from tree contact despite its awareness of a long history of outages related to tree contact.  (Doc. 64-4, Ex. C at 2; Ex. 71-2, Ex. 2 at 2).  Met-Ed narrowly focuses on a single statement in Panunto's deposition, in which he stated "we don't know why the breaker tripped."  (Doc. 74 at 5 (citing Panunto Dep. 75:4-5)).  In context, Mr. Panunto acknowledged that there is no direct evidence as to the cause of the breaker tripping; however, he testified that, based on his personal experience, industry knowledge and Met-Ed's internal records, the most likely cause of the breaker tripping and power outage was vegetation contact.  (Panunto Dep. 85:22-87:14; see also Doc. 64-5, Ex. D).

Mr. Panunto further attests that "the area around Ms. Sonnen's home and the 720 distribution line is a tree-filled area with above-ground electrical lines." (Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  Met-Ed cites a contradiction with Mr.

Panunto's testimony that he did not drive along the distribution line to evaluate vegetation management.  (Panunto Dep. 81:19-83:12, 95:11-14).  Upon review of the affidavit, it is clear that this statement merely establishes the parameters of Mr. Panunto's personal observations and photographic record from his investigation of Ms. Sonnen's home.  (See Doc. 64-4, Ex. C at 2-3; Doc. 71-2, Ex. 2 at 2-3).

Lastly, Met-Ed asserts that Mr. Panunto raises the phenomenon of arc-tracking for the first time in his affidavit in order to explain the gap between the reclosing of the circuit breaker and the initial report of the fire.  (Doc. 74 at 6). However, Mr. Panunto opined that arc-tracking ultimately caused the electrical fire in both his report and deposition.  (Doc. 59-1, Ex. 1 at 4-5; Doc. 71-1, Ex. 1 at 4-5; Panunto Dep. 72:19-21).  He was simply never asked to explain or given an opportunity to explain his opinion during the course of his deposition.

The court finds no indication that USAA submitted the affidavit or completed the errata sheet in bad faith.[4]  In the errata sheet, Mr. Panunto maintains that he is not an expert in vegetation management, but clarifies that his line management experience included assessments of vegetation management.

_____

[4] Met-Ed avers that the timing of the affidavit and errata sheet are suspect because both documents were filed in response to the motion *in limine*.  (Doc. 74 at 4, 6-7).  This argument is unavailing.  It is well-established that a party may use a supporting affidavit to elaborate upon, explain, or clarify prior testimony elicited by opposing counsel in deposition.  See, e.g., Grosso v. UPMC, 857 F. Supp. 2d 517, 523 n.5 (W.D. Pa. 2012); Lytle v. Capital Area Intermediate Unit, No. 1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009).  Moreover, Med-Ed took the deposition of Mr. Panunto on December 19, 2013.  (Doc. 59 ¶ 12; Doc. 71 ¶ 12).  Assuming USAA received the deposition transcript on the same day, USAA completed the errata sheet within 30 days on January 16, 2014.  (See Doc. 64-5, Ex. D).

(Doc. 64-5, Ex. D).  Consistent with his expert report and deposition testimony, Mr. Panunto also elaborated upon the basis for his opinion that vegetation contact caused the power outage on November 17, 2010.  (Id.; Doc. 59-1, Ex. 1 at 1-3; Doc. 71-1, Ex. 1 at 1-3; Panunto Dep. 23:14-25).  Because no statement is "flatly contradictory" to prior deposition testimony, the court declines to strike Mr. Panunto's affidavit and errata sheet.

**B.**     **Motion *in limine***

In its motion *in limine*, Met-Ed challenges Mr. Panunto's expert testimony on the basis of his qualifications, as well as the reliability and, therefore, the relevance of his opinions.  (See Doc. 57).  Hence, the court will address each Rule 702 requirement.[5]

**i.**     ***Qualifications***

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony."  Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 335 (3d Cir. 2002) (quoting Waldorf v. Shuta, 142 F.3d 601,

---

[5] The court will not hold a Daubert hearing on the motion *in limine* to exclude the testimony of Mr. Panunto.  The decision "to hold [a Daubert hearing] rests in the sound discretion of the district court" and, as noted by the Third Circuit, a Daubert hearing is not always required.  Padillas v. Stork–Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999).  There is a full record before the court on the issue of admissibility, including Mr. Panunto's expert report, deposition, and affidavit.  Nothing more is required for a court to determine the admissibility of an expert witness.  See Oddi v. Ford Motor Co., 234 F.3d 136, 154 (3d Cir. 2000) (upholding district court's decision to deny a Daubert hearing where the court "already had before it the depositions and affidavits of the plaintiff's experts"); States v. Fernwood Hotel & Resort, No. 12-0906, 2014 WL 198568, at *1 (M.D. Pa. Jan. 15, 2014).

625 (3d Cir. 1998)).  The Third Circuit has instructed courts to interpret the

qualification requirement "liberally" and not to insist on a particular degree or

background when evaluating the qualifications of an expert.  Waldorf, 142 F.3d at

625.  "The language of Rule 702 and the accompanying advisory committee notes

make clear that various kinds of 'knowledge, skill, experience, training, or

education,' qualify an expert as such."  In re Paoli R.R. Yard PCB Litig. ("Paoli I" ),

916 F.2d 829, 855 (3d Cir. 1990) (quoting FED. R. EVID. 702).

"This liberal policy of admissibility extends to the substantive as well as the

formal qualifications of experts."  Pineda, 520 F.3d at 244.  Thus, the court has

"eschewed imposing overly rigorous requirements of expertise and [has] been

satisfied with more generalized qualifications."  In re Paoli II, 35 F.3d at 741.  "It is

an abuse of discretion to exclude testimony simply because the trial court does not

deem the proposed expert to be the best qualified or because the proposed expert

does not have the specialization that the court considers most appropriate."

Pineda, 520 F.3d at 244 (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782

(3d Cir. 1996)).

In the instant motion in limine, Met-Ed argues that Mr. Panunto's opinions

regarding the breach of a duty of care are necessarily based on expertise in

vegetation management.  (Doc. 57 at 5-7).  However, Mr. Panunto is not qualified to

offer such opinions because he admitted in his deposition that he has no special

training or specific expertise in vegetation management.  (Id. at 6).  The court finds

this argument unpersuasive.

In its expert disclosures, USAA designated Mr. Panunto as an electrical engineering, electric utility, and forensic fire causation expert to opine on the standards of care for electric utilities and breach thereof, as well as the cause of the electrical fire.  (Doc. 64-1 at 5; Doc. 64-2, Ex. A; Doc. 71-6, Ex. 6).  USAA relied principally upon Mr. Panunto's over 40 years of experience in line management, and most assuredly did not retain Mr. Panunto solely to evaluate vegetation management.  (Doc. 64-1 at 5-6; Doc. 64-3, Ex. B; Doc. 71-4, Ex. 4).  In his capacity as a forensic engineer, Mr. Panunto has investigated and testified in numerous cases involving inadequate tree trimming resulting in outages, electric shock to persons, and death.  (Doc. 64-1 at 6; Doc. 64-4, Ex. C at 2; Doc. 71-2, Ex. 2 at 2).  As a result, Mr. Panunto has become familiar with both state and national guidelines for vegetation management related to distribution and transmission lines.  (Doc. 64-1 at 6; Doc. 64-4, Ex. C at 2; Doc. 71-2, Ex. 2 at 2).

Accordingly, the court finds that Mr. Panunto need not be a substantive expert in vegetation management; his expertise in the electric utility industry is more than sufficient to opine on the breach of a duty of care and likely cause of the electrical fire in Ms. Sonnen's home.  Any further deficiencies in Mr. Panunto's qualifications, such as the lack of specialized training in vegetation management, goes to the weight of his testimony rather than its admissibility.  Therefore, Mr. Panunto satisfies Rule 702's liberal qualification requirement.

### ii.   *Reliability*

Met-Ed also contests the reliability of Mr. Panunto's proposed testimony. (Doc. 57 at 8-13).  Expert testimony is "reliable" when it is based upon sound methodology and technique.  <u>In re</u> Paoli II, 35 F.3d at 742.  The touchstone is whether the expert's methodology is "sufficiently reliable so that it will aid the jury in reaching accurate results."  <u>Id.</u> at 744 (internal quotation omitted).  Notably, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness."  <u>Id.</u>  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  <u>United States v. Mitchell</u>, 365 F.3d 215, 244 (3d Cir. 2004) (quoting <u>Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 85 (1st Cir. 1998)); <u>Kannankeril</u>, 128 F.3d at 806 ("Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined").

The Third Circuit has enumerated several factors to guide the court's reliability inquiry:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established

15

to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 248 (citing In re Paoli II, 35 F.3d at 742 n.8).  This list of factors is a "convenient starting point," but is "neither exhaustive nor applicable in every case."  Kannankeril, 128 F.3d at 806-07.  In some cases, the relevant reliability concerns "may focus upon personal knowledge or experience," rather than "scientific foundations."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); see also States, 2014 WL 198568, at *3 (holding that expert's practical and specialized experience rendered his opinions sufficiently reliable despite a lack of a scientific hypothesis or testable theory).  Accordingly, the Rule 702 reliability inquiry is a flexible one, and the factors considered must be tied to the facts of the case.  Kumho Tire Co., 526 U.S. at 141.

On January 11, 2011, Mr. Panunto conducted an independent fire investigation at the scene of the electrical fire in accordance with National Fire Protection Association 921 *Guide for Fire and Explosion Investigations*.[6]  (Doc. 59-1, Ex. 1 at 1; Doc. 71-1, Ex. 1 at 1; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  Mr. Panunto began with an external inspection and made a contemporaneous photographic record of the electric service entering Ms. Sonnen's basement.

---

[6] Numerous courts have recognized NFPA 921 as reliable for purposes of Rule 702.  See, e.g., Hoang v. Funai Corp., Inc., 652 F. Supp. 2d 564 (M.D. Pa. 2009); Booth v. Black & Decker, Inc., 166 F. Supp. 2d 215, 220 (E.D. Pa. 2001); United States v. Zhou, Crim. A. No. 06-286, 2008 WL 4067103, *5 (D.N.J. Aug. 25, 2008) (citing Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1057-58 (8th Cir. 2005).

(Panunto Dep. 20:10-24; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  He then received a briefing from the fire marshal, who stated that the fire started inside the distribution panel at the main circuit breaker right below the kitchen and burned up through the kitchen floor.  (Panunto Dep. 22:11-23:4; see also Doc. 59-1, Ex. 1 at 2; Doc. 71-1, Ex. 1 at 2).  The fire marshal also indicated that there were strong, gusty winds on the day of the fire and that lights had been blinking on and off in the neighborhood, suggesting that a power surge impacted the circuit breaker. (Panunto Dep. 23:18-25; see also Doc. 59-1, Ex. 1 at 1-2; Doc. 71-1, Ex. 1 at 1-2).

Mr. Panunto continued his inspection from the outside to the inside of the house, and from the least damaged to most damaged areas of the house in order to identify the source of the fire.  (Panunto Dep. 29:8-11, 30:3-31:21; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  Mr. Panunto inspected all other electrical devices to eliminate them as the cause of the fire.  (Panunto Dep. 28:12-31-2; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  After identifying the distribution panel in the basement as the origin of the fire, Mr. Panunto proceeded to examine all of the electrical work around the distribution panel.  (Panunto Dep. 35:2-39:11; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  Upon agreement of the parties, Mr. Panunto retained the electric service cable and distribution panel for further investigation.  (Panunto Dep. 39:6-41:10).

On November 8, 2012, Mr. Panunto and the other relevant parties dissected and examined the retained evidence in Mr. Panunto's laboratory.  (Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).  During the investigation, Mr. Panunto did not find any

17

indication that there was a defect in the main circuit breaker or that any water damage or dirt accumulation caused a deterioration of the panel. (Panunto Dep. 58:20-62:9; 88:13-90:24; Doc. 64-4, Ex. C at 2, 4; Doc. 71-2, Ex. 2 at 2, 4). Mr. Panunto used the police and fire department reports, witness statements, and Met-Ed's internal records to deduce that vegetation contacted the distribution line on November 17, 2010 as a result of high winds and inadequate tree trimming. (Panunto Dep. 67:13-68:4; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3; Doc. 59-1, Ex. 1 at 3; Doc. 71-1, Ex. 1 at 3). This vegetation contact caused the tripping of the Zionsview substation breaker. (Doc. 59-1, Ex. 1 at 3; Doc. 71-1, Ex. 1 at 3). As a result of a seven-second power outage, high-voltage transients initiated arc-tracking at the main circuit breaker in Ms. Sonnen's home and caused the electrical fire. (Panunto Dep. 71:17-72:21; 95:5-99:21; Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5; Doc. 64-4, Ex. C at 3; Doc. 71-2, Ex. 2 at 3).

The court notes that Met-Ed does not challenge the method by which Mr. Panunto conducted his investigation. (Doc. 74 at 9). Rather, Met-Ed argues that Mr. Panunto's opinions do not reliably flow from the known facts. (Doc. 57 at 9-13; Doc. 74 at 9). In particular, Met-Ed challenges Mr. Panunto's conclusion that vegetation contact caused the tripping of the Zionsview substation breaker despite the absence of any direct evidence of vegetation contact, and the occurrence of electrical transients sufficient to cause a breakdown of electrical equipment. (Doc. 74 at 9). Even if vegetation contact occurred, Mr. Panunto merely offers subjective opinions on the adequacy of Met-Ed's vegetation management. (Id.)

18

Met-Ed primarily relies upon <u>Buzzerd v. Flagship Carwash of Port St. Lucis, Inc.</u>, 669 F. Supp. 2d 514 (M.D. Pa. 2009), <u>aff'd</u>, 397 F. App'x 797 (3d Cir. 2010).  In that case, the court found that the first expert did not possess proper qualifications or offer any methodology for his opinions on the relevant issue in the case, and the second expert ignored his own scientific data to reach his conclusions.  <u>Id.</u> at 522-30. Both experts' opinions were thus "based on speculation, and [were] not the product of a reliable methodology."  <u>Id.</u> at 524.  <u>Buzzerd</u> is distinguishable from this case.

Unlike <u>Buzzerd</u>, Mr. Panunto is not offering a mere theory on the issues of breach of duty and causation.  Mr. Panunto conducted a thorough and methodical investigation to eliminate other potential causes of the electrical fire, such as equipment defect and environmental factors.  He used circumstantial record evidence showing a high likelihood of vegetation contact with the 720 distribution line to conclude that such contact initiated a power outage and high-voltage transients, which caused the fire in Ms. Sonnen's electrical equipment.

On December 19, 2013, Met-Ed deposed Mr. Panunto, in which Mr. Panunto elaborated upon his opinions regarding breach of a duty of care and causation.  Mr. Panunto noted that, in the two years preceding the fire, the circuit breaker at the Zionsview substation tripped 24 times.  (Panunto Dep. 96:14-17).  Met-Ed's internal records indicate that many of those outages were caused by windy conditions, leading to an inference of vegetation contact.  (Panunto Dep. 67:22-68:12, 87:10-23; <u>see</u> <u>also</u> Doc. 64-5, Ex. D).  Mr. Panunto also relied upon his own experience and industry peer-reviewed materials to conclude that vegetation contact with the 720

19

distribution line most likely caused the seven-second power outage. (Panunto Dep. 85:22-87:4). Mr. Panunto explained that it is well-established in the electric utility industry that "probably 90 percent of all distribution line outages are caused by vegetation." (Panunto Dep. 86:9-11; 95:5-22). "[I]f we've had this many outages over the past few years[,] . . . there has to be a problem with the vegetation management." (Panunto Dep. 99:19-21).

Mr. Panunto next opined that the repeated power outages triggered repeated high-voltage transients, thus causing accelerated wear and eventual failure of the main circuit breaker. (Panunto Dep. 96:23-97:2). In his report, Mr. Panunto cited to peer-reviewed materials regarding the negative effects of breaker trips and high-voltage transients on electrical equipment. (Doc. 59-1, Ex. 1 at 3-4; Doc. 71-1, Ex. 1 at 3-4). Mr. Panunto acknowledges that Met-Ed did not maintain any instrumentation on the 720 distribution line to measure the precise levels of the transients from each breaker trip. (Panunto Dep. 97:3-13). Nevertheless, Mr. Panunto testified that the electrical system was not designed to handle high-voltage transients on such a frequent basis. (Panunto Dep. 72:4-11).

Upon a review of the record, the court finds that "there is not such a great gap between the data and the conclusion reached to render [the expert's] opinion unreliable." Hoang, 652 F. Supp. 2d at 574. The court will not exclude Mr. Panunto's opinions simply because there is no direct evidence of vegetation contact or concrete measurements of the voltage transients on the 720 distribution line. Mr. Panunto's opinions are consistent with his personal and practical experience, the

reasonable inferences from Met-Ed's internal records of power outages, and peer-reviewed material on the impact of such outages. Thus, Mr. Panunto meets the reliability standard under Rule 702.

### iii.   Fit

The third prong of the Rule 702 inquiry requires that the expert testimony "fit" by assisting the trier of fact. Oddi, 234 F.3d at 145. Admissibility under the fit standard depends in part on the proffered connection between the expert's investigation results and the factual disputes in the case. See In re Paoli II, 35 F.3d at 843. The instant case turns on whether Met-Ed breached a duty of care to supply safe and reliable electrical service and thereby caused the electrical fire. Mr. Panunto's opinions that inadequate vegetation management caused a pattern of power outages and high-voltage transients that eventually started the fire in Ms. Sonnen's home are clearly relevant to the issue of negligence. Therefore, the court concludes that Mr. Panunto's expert report and testimony will assist the jury in deciding the case and the court will deny the motion *in limine*.

### C.   Motion for Summary Judgment

### i.   Negligence Claim

Met-Ed's motion for summary judgment centers upon the argument that USAA lacks adequate evidence to establish the breach of duty and causation elements of a negligence claim without Mr. Panunto's expert testimony. (Doc. 60 at 4-9). Given the court's conclusion that Mr. Panunto's expert testimony is

admissible, the court must assess whether there is adequate evidence as a matter of law to preclude summary judgment on the negligence claim.

Under Pennsylvania law, a plaintiff must demonstrate each of the following factors for a negligence claim: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another.  Thomas ex rel. Thomas v. Staples, Inc., No. 09-3771, __ F. Supp. 2d __, 2014 WL 882671, at *9 (E.D. Pa. Mar. 6, 2014) (citing Morena v. South Hills Health Sys., 462 A.2d 680, 684 n.5 (Pa. 1983)); R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005).

The parties do not dispute that Met-Ed faces a legally cognizable duty to provide safe and reliable electric service.  (See Doc. 71-7, Ex. 7 at 10).  The NESC establishes the relevant standard of care for electrical utilities and is incorporated into Met-Ed's Tariff.  (Doc. 71-13, Salver Dep. 27:4-31:14, Apr. 12, 2013; Doc. 59-3, Ex. 3; Doc. 72 at 4).  In particular, Rule 218 of the NESC provides that "[v]egetation that may damage ungrounded supply conductors should be pruned or removed." (Doc. 71-2, Ex. 2 at 2; Doc. 72 at 4).  Met-Ed recognizes its duty on its website and informs its customers that, "[t]o provide safe and reliable electric service for our customers, trees must be properly maintained and kept clear of electric power lines." (Doc. 71-7, Ex. 7 at 14).

USAA relies on Mr. Panunto's expert report and testimony to establish Met-Ed's breach of the duty of care.  (Doc. 72 at 5-6).  In his expert report, Mr. Panunto

opined that Met-Ed breached its duty of care when it failed to properly manage vegetation contact with the 720 distribution line. (Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5). As previously discussed, the evidence of such breach stems from a history of power outages in the two years preceding the electrical fire in Ms. Sonnen's home. (See Doc. 71-2, Ex. 2 at 2-3). Based upon his experience and industry knowledge, Mr. Panunto concluded that the explanation for such frequent power outages and the outage at issue is vegetation contact. (Id.) Met-Ed's own records indicate that many of the power outages occurred in stormy or windy conditions. (See Salver Dep., Ex. 1). In fact, on November 17, 2010, Met-Ed recorded windy conditions in excess of 45 mph next to the entry for the 12:57 p.m. power outage. (Id.) The fire marshal also informed Mr. Panunto that there were strong, gusty winds, causing the lights in the area to flicker. (Panunto Dep. 23:18-25; Doc. 59-1, Ex. 1 at 1-2; Doc. 71-1, Ex. 1 at 1-2). Lastly, Ms. Sonnen's neighbor, Jessica Ballew, estimated up to 60 power interruptions in approximately 11 years and testified that Ms. Sonnen's brother, Edwin Clemens, often helped manage vegetation contact on her electric lines. (Doc. 59-1, Ex. 1 at 4; Doc. 71-1, Ex. 1 at 4; Doc. 11-11, Ex. 9, Ballew Dep. 7:20-25, 19:19-20:23, 27:3-14, May 8, 2013).

In response, Met-Ed argues that USAA must establish not only vegetation contact, but that the vegetation contact was the result of inadequate vegetation management. (Doc. 75 at 2). Met-Ed notes that Mr. Panunto found Met-Ed's vegetation management plan to be approved by the PPUC and in compliance with the NESC. (Doc. 60 at 6-7; Doc. 75 at 4). This argument is inapposite. The

existence of the vegetation management plan does not negate evidence of non-compliance with the plan.  The court finds that summary judgment is inappropriate because sufficient evidence exists to support a judgment in favor of USAA on the issue of breach of the duty of care.

With respect to causation, Mr. Panunto provided a detailed explanation of his investigation and peer-reviewed materials to support his conclusion that frequent power outages from vegetation contact triggered electrical transients that caused accelerated wear and eventual failure of Ms. Sonnen's electrical equipment.  (Doc. 59-1, Ex. 1 at 4-5; Doc. 71-1, Ex. 1 at 4-5).  Based upon the expert opinion and the record evidence, a reasonable jury could conclude that the power outage on November 17, 2010 was the straw that broke the camel's back.  The electrical transients caused the main circuit breaker to flash over and initiate electric arcing, thus igniting the electrical panel.

The information on Met-Ed's website also supports Mr. Panunto's opinions regarding the impact of electrical transients on electrical equipment.  Met-Ed warns its customers that "the effect of power disturbances may range from instant breakdown to more gradual deterioration over time."  (Doc. 71-7, Ex. 7 at 17).  Based upon this evidence, the court will deny Met-Ed's motion for summary judgment on the issue of causation.

### ii. *Rule 24 of the Tariff Bars Negligence Claim*

Met-Ed also seeks summary judgment on USAA's negligence claim on grounds that Rule 24 of the Tariff limits Met-Ed's liability for claims arising from

defects with electrical wiring and equipment installed by its customers.  (Doc. 60 at

10-11).  Rule 24 provides, in relevant part, that:

> The Customer, by accepting service from the Company, assumes
> responsibility for the safety and adequacy of the wiring and equipment
> installed by the Customer.  The Customer agrees to indemnify and save
> harmless the Company from any liability which may arise as a result of
> the presence or use of the Company's electric service or property, defects
> in wiring or devices on the Customer's premises, or the Customer's
> failure to comply with the National Electrical Code.

(Doc. 59-3, Ex. 3).

Met-Ed refers to Mr. Panunto's report to establish that the cause of the

electrical fire was "accelerated wear and catastrophic deterioration of the main

circuit breaker in the Sonnen's distribution panel."  (Doc. 60 at 10-11 (quoting Doc.

59-1, Ex. 1 at 5)).  The report also stated that the main circuit breaker was a pre-

existing weak point on the electric system, which can prematurely age or

immediately flash over as a result of electric transients.  (Doc. 75 at 5-6 (citing Doc.

59-1, Ex. 1 at 3)).  Because Ms. Sonnen bears responsibility for the installation and

maintenance of her electrical equipment, Rule 24 bars the negligence claim.  (Doc.

60 at 10; Doc. 75 at 5; see also Panunto Dep. 66:7-17, 91:9-92:10).

The court finds, however, that a genuine issue of material fact exists as to the

cause of the electrical fire.  Even though the main circuit breaker was the ultimate

cause of the fire, Mr. Panunto opined that Met-Ed's inadequate vegetation

management caused accelerated wear and deterioration of the electrical equipment

in the first instance.  (Doc. 72 at 7).  Specifically, Mr. Panunto explained that the

circuit breakers serve to protect the electrical panel in the home up to a certain

point.  (Panunto Dep. 62:24-66:3).  Ostensibly, Met-Ed should have installed

overcurrent fuses, which are weak links that isolate the source of an overcurrent, on

their distribution lines.  (Panunto Dep. 93:24-94:15).  Without such fuses, the

frequency of the power outages and electrical transients inflicted "sustained

trauma" on Ms. Sonnen's electrical equipment.  (Panunto Dep. 72:5-11).  Mr.

Panunto further eliminated equipment defect and environmental factors, such as

dirt accumulation or water damage, as potential causes of the electrical fire.

(Panunto Dep. 58:20-62:9, 88:4-90:24; Doc. 71-2, Ex. 2 at 2, 4).  Given the factual

dispute on the issue of causation, the court must submit the negligence claim to the

jury and deny the motion for summary judgment.[7]

### iii.    *Wanton Misconduct*

Lastly, Met-Ed moves for summary judgment on the claim for wanton

misconduct and asserts that the grant of summary judgment would deprive the

court of subject-matter jurisdiction.  (Doc. 60 at 11-13).  Without a willful or wanton

---

[7] USAA asserts that Rule 24 of the Tariff does not require Ms. Sonnen or her subrogee to indemnify Met-Ed under certain contract principles.  (Doc. 72 at 7-8). Because the court concludes that Rule 24 of the Tariff does not bar USAA's claims, the court need not consider this argument.

misconduct claim, Rule 24 of the Tariff limits Met-Ed's liability to $500,[8] precluding

an amount in controversy in excess of $75,000 for diversity jurisdiction.  (Id. at 13).

   In the amended complaint, USAA claims that Met-Ed's failure to adequately

manage vegetation along the 720 distribution line with knowledge of unsafe

conditions constitutes wanton misconduct.  (Doc. 10 ¶¶ 19-20; see also Doc. 72 at 2).

The Tariff, however, does not define a claim for wanton misconduct.  Under

Pennsylvania law, wanton misconduct means that the defendant has "intentionally

done an act of an unreasonable character, in disregard of a risk known to him or so

obvious that he must be taken to have been aware of it, and so great as to make it

highly probable that harm would follow.  It usually is accompanied by a conscious

indifference to the consequences."  Evans v. Phila. Transp. Co., 212 A.2d 440, 443

(Pa. 1965) (citing PROSSER ON TORTS § 33 at 151 (2d ed. 1955)).  "*[A]ctual* prior

knowledge of the injured person's peril need not be affirmatively established to

constitute wanton misconduct."  Id. at 443-44 (emphasis in original).  "If the

[defendant] realizes *or* at least has knowledge of sufficient facts to cause a

---

[8] Paragraph 3 of Rule 24 provides that:

> [U]nless caused by willful and or wanton misconduct of the Company, the liability of the Company to Customers or third parties for all injuries and damages . . . caused by various interruptions in electrical supply, high or low voltage, spikes, surges, single phasing, phase failure or reversal, stray voltage, neutral to earth voltage, equipment failure or malfunction, response time to electrical outages and emergencies . . . shall be limited to Five Hundred Dollars ($500) for residential customers. . . .

(Doc. 60 at 11; Doc. 59-3, Ex. 3).

reasonable man to realize the existing peril for a sufficient period of time beforehand to give him a reasonable opportunity to take means to avoid the accident, then he is guilty of wanton misconduct if the [defendant] recklessly disregards the existing danger." Id. at 444 (emphasis in original).

Pennsylvania courts have adopted the definition of reckless set forth in Section 500 of the Restatement (Second) of Torts. Stubbs v. Frazer, 454 A.2d 119, 120 (Pa. Super. Ct. 1982). A defendant is reckless when he "intentionally does an act or fails to do ant act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the [defendant's] conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." Evans, 212 A.2d at 444; see also Stubbs, 454 A.2d at 120-21 (citing Restatement (Second) of the Law of Torts § 500 (1965)). "If the conduct involves a high degree of chance that serious harm will result, the fact that the [defendant] knows or has reason to know that another person is within the range of its effect is conclusive of his or her recklessness." Evans, 212 A.2d at 444 (quoting Restatement (Second) of the Law of Torts § 500 cmt. d (1965)).

Wanton misconduct is different from both negligence and willful misconduct. Negligence consists of "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions," whereas recklessness or wanton misconduct requires a "conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger

to any reasonable man." <u>Stubbs</u>, 454 A.2d at 120-21 (quoting Restatement (Second) of the Law of Torts § 500 cmt. g (1965)).  Willful misconduct goes a step beyond wanton misconduct and exists when a defendant desires to bring about the result or he is aware that it was substantially certain to ensue.  <u>Saaybe v. Penn. Cent. Transp. Co.</u>, 438 F. Supp. 65, 69 n.6 (E.D. Pa. 1977) (citing <u>Evans</u>, 212 A.2d at 443).  The crucial issue in determining liability under any of the three categories is whether or not the defendant had reason to know of the risk of harm created by his conduct.  <u>Id.</u>  As a general rule, it is the role of the jury to determine the extent of a defendant's knowledge under the circumstances.  <u>Id.</u>; <u>Evans</u>, 212 A.2d at 445; <u>Stubbs</u>, 454 A.2d at 121.

In the instant action, USAA relies upon Mr. Panunto's expert opinions and Met-Ed's documentary evidence to establish a claim for wanton misconduct.  (Doc. 72 at 12).  On its website, Met-Ed reaffirms its duty to provide safe and reliable electric service to its customers by conducting vegetation management.  "Keeping our transmission and distribution rights-of-way free of incompatible trees and other vegetation is key to ensuring reliable and safe electric service.  Trees are a leading cause of electrical power outages.  In fact when trees and power lines touch it is a very dangerous situation and may even be deadly to anyone in close proximity."  (Doc. 71-7, Ex. 7 at 12, 14).  Met-Ed also recognizes the effect of electrical disturbances on electrical equipment within the home by stating that "the effect of power disturbances may range from instant breakdown to more gradual deterioration over time."  (<u>Id.</u> at 17).

29

A reasonable jury could find that Met-Ed recklessly ignored its duty to provide safe and reliable electric service as well as the high risk of electrical disturbances damaging its customers' electrical equipment.  Met-Ed had sufficient facts to investigate the issue of vegetation contact; indeed, it is undisputed that Met-Ed recorded 24 power outages in just two years on a single distribution line.  (See Salver Dep., Ex. 1).  Met-Ed was aware of probable vegetation contact from both customer complaints and its own records of power outages on windy or stormy days.  (Id.; Doc. 71-2, Ex. 2 at 3; Panunto Dep. 67:19-68:4; Doc. 64-5, Ex. D).  Despite Met-Ed's knowledge of the numerous power outages, Met-Ed did not perform necessary vegetation management.  (Doc. 59-1, Ex. 1 at 5; Doc. 71-1, Ex. 1 at 5).

Met-Ed counters that, in accordance with its vegetation management plan, Met-Ed performed vegetation management on the 720 distribution line just one year before the fire.  (Doc. 75 at 7).  Moreover, Ms. Ballew's complaints did not relate to the 720 distribution line and are therefore irrelevant to Met-Ed's knowledge.  (Doc. 60 at 12-13).  The court notes that neither argument contravenes the evidence of Met-Ed's failure to address numerous power outages on the 720 distribution line.  Therefore, the court finds that USAA proffers sufficient evidence of Met-Ed's knowledge of repeated vegetation contact and failure to act to survive summary judgment.

IV.    **Conclusion**

For the reasons stated above, the court will deny Met-Ed's motion *in limine*

(Doc. 56) and motion for summary judgment (Doc. 58).

An appropriate order will issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      July 16, 2014